**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**THADDEAUS SIMS,**

Plaintiff,

v.

**MARK PAOLETTA, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,**

Defendant.

Civil Action No. 1:26-cv-03282

**COMPLAINT FOR RACE DISCRIMINATION, DISPARATE IMPACT, AND RETALIATION UNDER TITLE VII**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Thaddeaus Sims ("Plaintiff" or "Mr. Sims"), by and through undersigned counsel, brings this civil action against Mark Paoletta, in his official capacity as Acting Director of the Consumer Financial Protection Bureau ("CFPB" or the "Bureau"), and alleges as follows:

## NATURE OF THE ACTION

1. This is a federal-sector employment action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. Mr. Sims, a Black Compliance Examiner, challenges race discrimination, a facially neutral employment practice that disproportionately burdened Black CN-51 examiners, discrete retaliation, and a retaliatory hostile work environment.

2. The challenged conduct included a race-based reassignment to a materially less favorable, more complex, and travel-intensive examination; the assignment of Central Point of Contact and periodic-monitoring responsibilities to an overwhelmingly Black lower-grade cohort; and an escalating course of scrutiny, burdensome assignments, training demands, counseling, and other adverse treatment after protected EEO activity.

3. The Bureau accepted and investigated these claims in Agency No. CFPB-0025-2024. Its investigative record confirms, among other things, Mr. Sims's successful performance, management knowledge of his protected activity, material inconsistencies in management

explanations, and the absence of records or comparators substantiating several asserted reasons.

4. Mr. Sims timely commenced an earlier civil action after more than 180 days had elapsed from his formal EEO complaint. That action was dismissed without prejudice solely because it originated in the Superior Court of the District of Columbia and derivative jurisdiction therefore prevented the federal court from reaching the merits after removal under 28 U.S.C. § 1442. Mr. Sims files this action directly in the forum Congress designated, immediately after the Court resolved his same-day motion for relief from that non-merits dismissal.

## JURISDICTION AND STATUTORY BASIS

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-16(c). Title VII requires that personnel actions affecting federal employees be made free from discrimination based on race and prohibits retaliation for protected EEO activity.

6. Title VII is the exclusive judicial remedy for the race-discrimination and retaliation claims arising from the federal employment actions pleaded here. Plaintiff asserts no claim under the Americans with Disabilities Act, the Rehabilitation Act, USERRA, the Veterans' Preference Act, District of Columbia employment statutes, any collective-bargaining agreement, or tort law in this Complaint.

7. Defendant, in his official capacity as head of the CFPB, is the proper defendant under 42 U.S.C. § 2000e-16(c).

## ADMINISTRATIVE EXHAUSTION

8. Mr. Sims contacted an EEO counselor concerning the conduct at issue on June 3, 2024. The Bureau issued a Notice of Right to File a Formal Complaint on July 2, 2024, and Mr. Sims filed his formal EEO complaint on July 5, 2024.

9. Mr. Sims amended the administrative complaint on November 25, 2024 and January 28, 2025. The Bureau accepted and investigated the claims pleaded here: retaliatory harassment

comprising the related incidents described below; race-based disparate impact arising from the assignment of CPC and periodic-monitoring duties to CN-51 examiners; and race-based disparate treatment arising from the July 3, 2024 examination reassignment.

10. The Bureau completed its Report of Investigation on or about June 28, 2025 and transmitted the Report and notice of election rights on June 30, 2025. By then, substantially more than 180 days had elapsed since the July 5, 2024 formal complaint.

11. Mr. Sims did not elect an EEOC administrative-judge hearing. On August 11, 2025, the Bureau advised that it would issue a Final Agency Decision.

12. On September 19, 2025, while Mr. Sims's first civil action was pending, the Bureau issued a Final Agency Decision in Agency No. CFPB-0025-2024. The FAD addressed the same race-discrimination, disparate-impact, and retaliatory-harassment claims pleaded here and found no discrimination. The FAD was emailed to Plaintiff's counsel on September 19, 2025.

13. The FAD expressly recognized that Mr. Sims had already filed a civil action presenting the same or substantially similar Title VII claims. It did not dismiss the administrative complaint under 29 C.F.R. § 1614.107(a)(3) because the then-pending action had originated in D.C. Superior Court rather than a United States District Court.

14. Plaintiff has therefore exhausted the federal-sector EEO process as to every claim in this Complaint. This Complaint does not include the separate February 2025 stop-work or examination-removal matter that the Bureau declined to accept as like or related and referred to a separate counseling process.

## PROCEDURAL HISTORY OF THE PRIOR ACTION

15. On August 26, 2025, after more than 180 days had passed from the filing of his formal complaint and before the Bureau issued a FAD, Mr. Sims filed a civil action in the Superior Court of the District of Columbia, Sims v. Consumer Financial Protection Bureau, No. 2025-

CAB-005923 (the "Prior Action"). At that time, suit was authorized by 42 U.S.C. § 2000e-16(c) and 29 C.F.R. § 1614.407(b).

16. The Prior Action included the same or substantially similar Title VII claims and factual events at issue here. The Bureau had actual notice of the suit, reviewed it during the administrative process, and later appeared through counsel.

17. On September 19, 2025, the Bureau issued the FAD while the Prior Action remained pending. Assuming same-day receipt, the FAD stated that a new civil action could be filed within 90 calendar days, through December 18, 2025.

18. On October 24, 2025, the Bureau removed the Prior Action to this Court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), where it was assigned Case No. 1:25-cv-03769-CKK.

19. On November 21, 2025, the Bureau moved to dismiss. Its principal jurisdictional argument was that the Superior Court lacked jurisdiction over the federal claims and, under the derivative-jurisdiction doctrine applicable to removals under § 1442, this Court acquired no jurisdiction on removal even though the same claims could have been filed originally in this Court.

20. Plaintiff did not timely file an opposition by December 5, 2025. On December 16, 2025, the Court treated the motion as conceded and dismissed the Prior Action without prejudice. The order did not adjudicate any discrimination or retaliation claim on the merits.

21. The same day, December 16, 2025, Plaintiff moved under Federal Rule of Civil Procedure 60(b) to vacate the dismissal and tendered a proposed opposition. Plaintiff alleged a documented third-party technical communications failure affecting counsel's receipt of electronic-service communications and requested restoration of the action for merits adjudication.

22. On September 18, 2026, the Court denied Rule 60 relief. The Court concluded that counsel had not shown excusable neglect and, independently, that reopening would be futile because derivative jurisdiction required dismissal of claims over which the Superior Court lacked original jurisdiction. The Court reiterated that the December 16 dismissal was without prejudice and did not decide the merits of the exhausted Title VII claims.

23. This new action is filed directly in the United States District Court for the District of Columbia on September 18, 2026, promptly after the Rule 60 ruling identified direct refiling—not continuation of the removed action—as the procedurally proper route. Plaintiff reserves all appellate rights concerning the orders in the Prior Action.

**TIMELINESS AND EQUITABLE TOLLING**

24. Plaintiff timely invoked the alternative 180-day route to federal court when he filed the Prior Action on August 26, 2025, before the FAD issued. See 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(b). The later-issued FAD did not make that already-filed action untimely.

25. To the extent the September 19, 2025 FAD triggered a separate 90-day filing period that governs this refiled action, that period is nonjurisdictional and is subject to waiver, estoppel, and equitable tolling. Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990); Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997).

26. Plaintiff recognizes that a dismissal without prejudice ordinarily leaves the parties as though the dismissed action had never been filed for limitations purposes. See Ciralsky v. CIA, 355 F.3d 661, 672 (D.C. Cir. 2004). Plaintiff does not rely on automatic statutory tolling. He pleads case-specific equitable tolling based on the timely defective filing, continuous pursuit of judicial relief, actual notice, absence of prejudice, and the unusual derivative-jurisdiction trap presented here.

27. Equitable tolling has long been available where a plaintiff timely asserts rights in the wrong forum, thereby giving the defendant timely notice and avoiding prejudice from stale evidence.

Burnett v. New York Central Railroad Co., 380 U.S. 424, 428-30 (1965). Irwin likewise identifies a timely but defective pleading during the statutory period as a recognized basis for equitable tolling. 498 U.S. at 96.

28. Mr. Sims did not sleep on his rights. He commenced the Prior Action 24 days before the FAD, after the 180-day waiting period had run, and presented the same core Title VII claims against the same agency based on the same events.

29. The Bureau had actual, timely notice. It reviewed the Prior Action while preparing the FAD, identified the overlap in the FAD itself, removed the case, and litigated dismissal. The Bureau therefore cannot identify any loss of evidence, unavailable witness, surprise, or other limitations-related prejudice caused by this refiling.

30. The prior forum error created a highly unusual procedural defect. The Bureau itself removed under § 1442; Congress has abrogated derivative jurisdiction for ordinary removals under 28 U.S.C. § 1441 but not for § 1442 removals; and the result was dismissal from the very federal court that would have possessed original jurisdiction had the same pleading been filed there first.

31. When the Prior Action was dismissed on December 16, 2025—two days before the FAD's assumed 90-day period expired—Plaintiff sought Rule 60 relief that same day and tendered his merits opposition. He did not abandon the litigation or allow the dismissal to become unchallenged.

32. The Rule 60 motion remained pending until September 18, 2026. During that period, Plaintiff actively sought restoration of the same case, while a second action would have duplicated the same parties, claims, record, and requested relief and risked inconsistent case administration.

33. Plaintiff filed this action immediately after the Court resolved the Rule 60 motion and made clear that derivative jurisdiction foreclosed reopening the removed action. The period reasonably spent pursuing that live, same-day postjudgment motion should be equitably tolled.

34. The Court's rejection of excusable neglect under Rule 60 addressed counsel's failure to oppose the November 2025 motion; it did not decide whether the separate Title VII filing period should be equitably tolled based on the full sequence of timely administrative exhaustion, timely suit, actual notice, a non-merits wrong-forum dismissal, same-day postjudgment relief, and immediate direct refiling.

35. Plaintiff therefore requests equitable tolling from at least December 16, 2025 through September 18, 2026, or for such other period as the Court deems just. The combination of a timely defective pleading, agency removal, a non-merits derivative-jurisdiction dismissal while two days remained in the assumed filing period, a same-day Rule 60 motion, the pendency of that motion, and immediate direct refiling constitutes an extraordinary circumstance in this case; Plaintiff acted with reasonable diligence throughout. See Menominee Indian Tribe of Wisconsin v. United States, 577 U.S. 250, 255-57 (2016). On that basis, this Complaint is timely.

## VENUE

36. Venue is proper under 42 U.S.C. §§ 2000e-5(f)(3) and 2000e-16(d). The CFPB maintains and administers relevant centralized personnel, performance, training, EEO, scheduling, and policy records at or through its principal office at 1700 G Street NW, Washington, D.C. The challenged policies and training requirements were administered through CFPB headquarters, and relevant periodic-monitoring training was scheduled in this District.

37. Alternatively, venue lies in this District because Defendant, the Acting Director of the CFPB, maintains his official office here.

## PARTIES

38. Plaintiff Thaddeaus Sims is Black and resides in Houston, Texas. The CFPB hired him on or about September 7, 2014. During all relevant periods, he worked as a remote Compliance

Examiner, occupational series 0570, grade CN-51, in the Supervision Division, Southeast Region.

39. Defendant Mark Paoletta is the Acting Director and head of the CFPB. He is sued only in his official capacity. The CFPB is an executive agency headquartered in Washington, D.C.

40. Relevant management officials included Jeffrey Browning, Mr. Sims's first-line supervisor and a Field Examination Manager; John Lolley, Senior Examination Manager; Roy Thomas and Patrick Fraser, Assistant Regional Directors; and Fatima Batie, Regional Director. Each acted within the scope of Bureau employment.

## FACTUAL ALLEGATIONS

### A. Mr. Sims's qualifications and successful performance

41. Mr. Sims had approximately ten years of CFPB examination experience when the challenged conduct began. He performed mortgage, auto-servicing, transaction-testing, and other supervision work and possessed substantial knowledge of Bureau policies, examination tools, regulated entities, and supervisory procedures.

42. Mr. Browning rated Mr. Sims an "Accomplished Performer" in 2022 and 2023. The 2022 review credited his time management, ability to anticipate and overcome obstacles, and knowledge of the Supervision and Examination Manual. The 2023 review described his professionalism and collaborative attitude as an asset to the examination team.

43. Mr. Sims continued to perform successfully in 2024. His mid-year record credited him with identifying nine Regulation E violations and completing assignments within established guidelines. June 3 coaching notes documented excellent written communication and a manager's compliment for a quick file review and identified no performance problem.

44. The Bureau again rated Mr. Sims an "Accomplished Performer" at year end in November 2024. The narrative credited accurate independent work, successful transaction testing, and compelling communication of findings to CFPB stakeholders.

**B. Protected EEO activity and management knowledge**

45. Before the events at issue, Mr. Sims had engaged in protected EEO activity, including matters designated CFPB-12-596-F, CFPB-0018-2020, and CFPB-0021-2024. Mr. Browning was named as a responsible management official in earlier matters.

46. By no later than June 3, 2024, Mr. Sims initiated EEO counseling concerning the events in Agency No. CFPB-0025-2024. He filed the formal complaint on July 5, 2024 and thereafter opposed discrimination and retaliation through written objections, amendments, and participation in the EEO investigation.

47. Mr. Browning and Ms. Batie were identified to and interviewed by an EEO counselor. Mr. Browning discussed aspects of Mr. Sims's complaint with an EEO specialist and the Bureau's harassment and bullying program. Management knew or reasonably should have known of Mr. Sims's protected activity.

48. The challenged course began during the same period as Mr. Sims's protected activity and escalated after he objected to successive employment actions.

**C. Performance narrative, formalized coaching, and heightened scrutiny**

49. On April 24, 2024, Mr. Browning inserted a broad "developmental opportunities" directive into Mr. Sims's mid-year narrative instructing him to create a self-study plan and emphasizing that all Bureau policies and guidance must be followed at all times. The language suggested an unspecified deficiency even though Mr. Sims's documented results were strong and no performance problem had been identified.

50. After Mr. Sims objected that the language could be used as a predicate for a Performance Improvement Plan, Mr. Browning modified some wording but retained a broad admonition to stay abreast of policies and to align with regional, divisional, and Bureau standards. Mr. Browning asserted that he used the same language for all direct reports but did not answer Mr. Sims's written request to confirm that assertion.

51. On May 9, 2024, Mr. Browning announced monthly coaching sessions, with the first held on June 3. Although management characterized monthly check-ins as a general best practice, Mr. Sims had not previously received this formal, transcribed form of monthly scrutiny from Mr. Browning.

52. The sessions became a vehicle for questioning Mr. Sims in detail about assignments, findings, communications, leave, and training; memorializing his answers; pressing additional training and work; and making disparaging remarks. After Mr. Sims reported no violations on one matter, Mr. Browning responded in substance, "You didn't find anything? That's unusual."

53. Mr. Sims objected to the process and level of scrutiny. The monitoring continued even though his performance reviews and work feedback remained successful.

**D. Higher-grade CPC and periodic-monitoring work**

54. During the June 3, 2024 coaching session, Mr. Browning told Mr. Sims that he would be assigned Central Point of Contact ("CPC") duties for a medium-risk financial entity and would be responsible for periodic-monitoring work, including a risk profile or risk assessment.

55. A CPC functions as an account manager and principal contact for a regulated entity and other regulators, requests and transmits information, schedules and attends meetings, evaluates the entity's financial and supervisory condition, and develops an overall risk profile. A CN-52 position description expressly identifies service as CPC and Examiner-in-Charge work, while CN-51 materials describe assisting or participating in monitoring with guidance.

56. Mr. Sims had not been assigned sole CPC or periodic-monitoring responsibility during his prior ten years at the Bureau. He objected that the assignment was higher-grade work, inconsistent with his position description and development plan, and unfairly allocated.

57. Mr. Browning admitted selecting Mr. Sims for the medium-risk entity because Mr. Browning had no low-risk entities in his caseload. The assignment therefore imposed a more complex

monitoring burden rather than selecting a lower-risk assignment aligned with management's stated distinction between CN-51 and commissioned work.

58. The Bureau later contended that a Field Manager would retain the formal CPC designation and that CN-51 examiners could assist with monitoring. That explanation conflicted with the assignment as communicated to Mr. Sims, which made him responsible for the monitoring deliverable, and with management's inconsistent descriptions of who would own the work.

59. Even though a later Bureau directive halted the monitoring activity, the assignment, training burden, threatened use of the work in performance management, and resulting stress had already occurred. Plaintiff does not plead that later directive as a separate adverse action in this case.

**E. Duplicative periodic-monitoring training**

60. On June 5, 2024, Mr. Browning directed Mr. Sims to enroll in Periodic Monitoring training so that he could perform the new assignment. Mr. Sims had already completed the Bureau's Periodic Monitoring course on December 8, 2021 while supervised by Mr. Browning.

61. Mr. Sims promptly notified management of the prior completion. On June 10, Ms. Batie stated that, if the prior completion were confirmed, he would not be required to retake the course.

62. Nevertheless, on June 27, Mr. Thomas confirmed the prior course completion but required Mr. Sims to retake an updated version. During the EEO investigation, Mr. Thomas could not identify another examiner whose request not to repeat the course had been denied.

63. The repeat course consumed work time, increased Mr. Sims's workload, delayed existing assignments, and reinforced the message that management viewed him as deficient despite a decade of successful performance.

**F. Race-based reassignment and transaction-testing travel**

64. On July 3, 2024, Mr. Browning informed Mr. Sims that he was being removed from a geographically convenient Texas-area servicing assignment and reassigned to a more complex mortgage-origination examination scheduled for September 2024.

65. The new assignment required transaction testing, use of a difficult compliance tool, in-person training in Atlanta, and air travel associated with work in Georgia and Kentucky. It placed Mr. Sims back under Mr. Browning's close supervision and materially increased his preparation, workload, travel burden, and exposure to negative performance consequences.

66. The original assignment would have permitted Mr. Sims to travel by car from Houston and use virtual just-in-time training. The reassignment imposed less favorable conditions even though Mr. Sims already had mortgage-origination work scheduled for a later examination.

67. The transaction-testing group was initially staffed with Mr. Sims and two other Black examiners, with only two commissioned examiners available to support the work. The arrangement was modified after an examination lead questioned its fairness.

68. John Toca, a Caucasian examiner who also reported to Mr. Browning and was geographically close to the Texas assignment, remained associated with or was permitted to telework the more convenient servicing work. Management offered shifting or incomplete explanations about whether Mr. Toca had been reassigned and could not produce detailed 2024 reassignment information.

69. Mr. Fraser, the scheduling Assistant Regional Director with authority to approve reassignments, said the decision was "likely" caused by an unforeseen schedule change but could not identify the specific change or explain the selection of Mr. Sims. The reassignment departed from the published annual staffing plan and followed closely after Mr. Sims's complaints.

**G. Last-minute prerequisite work and selective enforcement**

70. On August 5, 2024, one week before the in-person Mortgage Origination Essentials course, Mr. Browning specifically directed Mr. Sims to complete several hours of prerequisite training and additional pre-course work. The compressed deadline required him to rush while carrying existing assignments.

71. During the course, Caucasian examiner Robert Bauguss stated that he had not completed the prerequisite work. Mr. Sims nevertheless was required to complete it and passed the course with an A.

72. The selective enforcement and compressed deadline increased Mr. Sims's workload and reinforced the pattern of heightened scrutiny following protected activity.

**H. Inaccurate travel-card counseling**

73. On August 26, 2024, Mr. Browning issued written counseling accusing Mr. Sims of having a travel-card balance more than 30 days past due, warning him not to miss further payments, and threatening referral to Human Capital under the Misconduct Policy.

74. Mr. Sims had paid the balance on or about August 6 and showed Mr. Browning confirmation that the account had been resolved. The card issuer later advised Mr. Sims that the payment had been only approximately seven days late, not 30 days delinquent. Mr. Sims also understood the governing policy to allow 45 days before an account became delinquent.

75. Mr. Browning admitted that he did not know who made the counseling decision and could not identify the sender of the email on which he relied. He nevertheless memorialized the inaccurate accusation in writing rather than withdrawing it after proof of payment.

**I. Questioning authorized administrative leave**

76. The CFPB Director authorized employees two hours of administrative leave on October 11, 2024. Mr. Sims accurately entered that leave on his timesheet.

77. On October 20, Mr. Browning returned or questioned the timesheet and required Mr. Sims to justify the authorized leave. On October 21, he told Mr. Sims to disregard the demand after locating the Director's authorization and certified the timesheet the next day.

78. Mr. Browning admitted that questioning timesheets was not common practice and that his challenge was an error. To Mr. Sims, the episode conveyed that routine conduct would be questioned and documented after his EEO activity.

**J. Unwanted Acting Examiner-in-Charge assignment**

79. On January 13, 2025, Mr. Sims learned that he had been assigned an Acting Examiner-in-Charge ("AEIC") role. An EIC plans an examination, determines its scope, directs other examiners, manages the work, and prepares the examination report and recommendations—substantial leadership duties beyond Mr. Sims's ordinary CN-51 work.

80. Mr. Sims was hired before the December 31, 2014 cutoff for mandatory participation in the Examiner Commissioning Program. He had previously told management that he did not wish to pursue commissioning, and the Bureau had removed him from a similar 2023 assignment after he objected.

81. Mr. Sims promptly asked Messrs. Browning, Thomas, and Fraser and Ms. Batie to remove the 2025 assignment. Management did not provide a contemporaneous explanation or meaningfully address the request, and responsible officials gave inconsistent testimony about who selected him.

82. The AEIC assignment added higher-grade leadership work, disregarded Mr. Sims's known and previously honored preference, and continued the escalating pattern of unfavorable assignments after protected activity.

**K. Disparate impact of the CN-51 monitoring practice**

83. The Bureau adopted or applied a specific practice of assigning CPC-related and periodic-monitoring responsibilities for medium-risk entities to non-commissioned CN-51 examiners

rather than limiting responsibility for that work to commissioned CN-52 and higher-grade examiners.

84. That facially neutral practice disproportionately burdened Black examiners because Black employees were overwhelmingly concentrated in the affected CN-51 cohort. Mr. Sims identified approximately 18 non-commissioned CN-51 examiners in the Southeast Region: 15 Black, one Caucasian, and two of unknown race. During EEO counseling, Mr. Thomas similarly identified approximately 21 non-commissioned CN-51 examiners, approximately 16 of whom were Black, and acknowledged that Black employees were the largest racial group in that classification.

85. As applied, the practice shifted complex, higher-responsibility work downward to a cohort that was approximately three-quarters to more than four-fifths Black, while employees in commissioned grades ordinarily associated with CPC responsibility were not subjected to the same uncompensated lower-grade burden. The precise comparative selection, grade-distribution, and assignment data are controlled by the Bureau and will be established through discovery.

86. The practice was not job related and consistent with business necessity as applied to require CN-51 examiners to own medium-risk CPC deliverables. Less discriminatory alternatives included assigning formal CPC responsibility to commissioned examiners; limiting CN-51 participation to guided assistance on low-risk entities; staffing adequate commissioned personnel; or providing an appropriate temporary detail, promotion pathway, and compensation for higher-grade work.

**L. Cumulative harm**

87. The challenged actions changed the terms and conditions of Mr. Sims's work and caused concrete harm, including increased workload, duplicative training, additional air travel, less favorable assignments, higher-grade responsibilities without corresponding grade or pay,

heightened performance risk, loss of professional standing, emotional distress, anxiety, humiliation, and related out-of-pocket and pecuniary losses.

88. Individually and collectively, the retaliatory acts would dissuade a reasonable employee from making or supporting an EEO complaint. Their frequency, escalation, common actors, and relationship to Mr. Sims's objections also created a retaliatory work environment that altered his working conditions and interfered with his ability to perform without fear of further reprisal.

89. Race and protected EEO activity were motivating factors in the challenged decisions. To the extent the Bureau identifies additional reasons, those reasons were inconsistent, unsupported, selectively applied, or pretextual.

## COUNT I

## RACE DISCRIMINATION - DISPARATE TREATMENT
## 42 U.S.C. § 2000e-16

90. Plaintiff incorporates the preceding paragraphs as if fully set forth here.

91. Mr. Sims is Black and was qualified for his Compliance Examiner position.

92. The July 3, 2024 reassignment imposed disadvantageous changes to the terms, conditions, and privileges of employment, including materially greater complexity, transaction-testing burdens, in-person training, air travel, and performance risk compared with the geographically convenient assignment from which he was removed.

93. A similarly situated Caucasian examiner remained associated with or was allowed to perform the more convenient work, while management could not identify a concrete schedule change, consistent selection criteria, or complete reassignment records explaining why Mr. Sims was chosen.

94. Race was a motivating factor in the reassignment. The Bureau's shifting, incomplete, and unsupported explanations permit an inference of intentional discrimination.

95. The Bureau thereby violated 42 U.S.C. § 2000e-16. Mr. Sims suffered compensable harm as a direct and proximate result.

**COUNT II**

**RACE DISCRIMINATION - DISPARATE IMPACT**
**42 U.S.C. §§ 2000e-2(k), 2000e-16**

96. Plaintiff incorporates the preceding paragraphs as if fully set forth here.

97. The challenged employment practice is the Bureau's assignment of CPC-related and periodic-monitoring responsibility for medium-risk entities to non-commissioned CN-51 examiners without the grade, compensation, or protections ordinarily associated with that responsibility.

98. The practice caused an adverse impact based on race because the affected Southeast Region CN-51 cohort was overwhelmingly Black, including approximately 15 of 18 identified examiners by Mr. Sims's count and approximately 16 of 21 by management's count.

99. The practice was not job related and consistent with business necessity as applied, and less discriminatory alternatives were available. The Bureau possessed but did not produce complete assignment, selection-rate, cohort, grade, and comparator data during the administrative process. Plaintiff will establish the full statistical disparity through discovery.

100. The Bureau thereby violated Title VII, and Mr. Sims suffered compensable harm as a direct and proximate result.

**COUNT III**

**RETALIATION - MATERIALLY ADVERSE ACTIONS**
**42 U.S.C. § 2000e-16**

101. Plaintiff incorporates the preceding paragraphs as if fully set forth here.

102. Mr. Sims engaged in protected activity by initiating and pursuing prior EEO matters; seeking EEO counseling by June 3, 2024; filing the July 5, 2024 formal complaint and amendments; opposing conduct he reasonably believed discriminatory or retaliatory; and participating in the Bureau's EEO process.

103. Management knew of that protected activity. Relevant officials were named in prior matters, participated in counseling and investigation, received Mr. Sims's objections, and discussed his complaint with EEO personnel.

104. After and during the protected activity, the Bureau subjected Mr. Sims to actions that, separately or together, could dissuade a reasonable employee from engaging in protected activity: negative and threatening performance language; formalized scrutiny; higher-grade CPC and periodic-monitoring duties; duplicative training; a less favorable reassignment; compressed prerequisite work; inaccurate misconduct-related travel-card counseling; questioning authorized leave; and an unwanted AEIC assignment.

105. The timing, escalation, common decisionmakers, comparator evidence, procedural departures, inconsistent explanations, and acknowledged errors support a plausible inference that protected activity was a motivating factor and that the same materially adverse actions would not have occurred absent retaliation.

106. The Bureau thereby retaliated against Mr. Sims in violation of Title VII and caused compensable harm.

## COUNT IV

## RETALIATORY HOSTILE WORK ENVIRONMENT
## 42 U.S.C. § 2000e-16

107. Plaintiff incorporates the preceding paragraphs as if fully set forth here.

108. The related incidents pleaded above involved overlapping managers, the same protected activity, a recurring pattern of heightened scrutiny and burdensome work, and an escalating course from performance documentation and coaching to training, reassignment, counseling, leave scrutiny, and higher-grade leadership responsibilities.

109. Viewed in their totality and in context, the incidents were sufficiently severe or pervasive to alter Mr. Sims's working conditions and create an abusive retaliatory environment. They also

were materially adverse because the cumulative campaign could dissuade a reasonable employee from engaging in EEO activity.

110. The close temporal relationship, management knowledge, repeated objections, inconsistent explanations, selective enforcement, acknowledged errors, and absence of consistent comparator records plausibly connect the environment to Mr. Sims's protected activity.

111. The Bureau is liable for the conduct of its supervisors and managers. The retaliatory hostile work environment violated Title VII and caused Mr. Sims compensable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and award:

A. A declaration that Defendant violated Title VII;

B. A permanent injunction prohibiting further race discrimination, retaliation, and retaliatory harassment, and requiring effective corrective measures;

C. Expungement or correction of retaliatory counseling, performance language, and related records;

D. Appropriate equitable relief, including restoration to favorable assignments, equal access to developmental and promotional opportunities, and any warranted promotion, detail, or other make-whole relief;

E. Back pay, front pay in lieu of unavailable equitable relief, lost benefits, and other pecuniary damages in amounts to be proven;

F. Compensatory damages for emotional distress and other nonpecuniary harm to the full extent allowed by law;

G. Prejudgment and postjudgment interest as allowed by law;

H. Reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k); and

I. Such other legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 18, 2026

Respectfully submitted,
*/s/ John L. Pittman III*

**John L. Pittman III, Esq.**
D.C. Bar No. 1742578
**JOHN L. PITTMAN III | ATTORNEY AT LAW, APC**
925 B Street, Suite 604
San Diego, California 92101
Direct: 760-575-4040
jlpittmaniii@jp3law.com
info@jp3law.com
*Counsel for Plaintiff Thaddeaus Sims*